**Christopher H. Kent, OSB #852530**
Email: ckent@kentlaw.com
**Leslie S. Johnson, OSB #954727**
Email: ljohnson@kentlaw.com
**KENT & JOHNSON, LLP**
1500 SW TAYLOR STREET
PORTLAND, OREGON 97205
TELEPHONE: (503) 220-0717
FACSIMILE: (503) 220-4299
Attorneys for Thomas A. Huntsberger, Trustee

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re:<br><br>Berjac of Oregon,<br><br>               Debtor(s). | Case No.: 12-63884-tmr11 |
| THOMAS A. HUNTSBERGER, Trustee<br><br>       Plaintiff,<br><br>    vs.<br><br>UMPQUA HOLDINGS CORPORATION dba UMPQUA BANK, an Oregon corporation; PACIFIC CONTINENTAL CORPORATION dba PACIFIC CONTINENTAL BANK, for itself and as successor-in-interest to CENTURY BANK; SUMMIT BANK; and JONES & ROTH, P.C., an Oregon professional corporation<br><br>       Defendants. | Adv. Proc. No. _____<br><br>**ADVERSARY COMPLAINT**<br><br>(Fraudulent Transfers; Aiding and Abetting Tortious Conduct; Unjust Enrichment and Restitution; Equitable Subordination; Voiding Authorization; Misrepresentation; Avoidance Claim; and Professional Negligence) |

Plaintiff Thomas A. Huntsberger, in his capacity as the court-appointed Chapter 7

Trustee for Berjac of Oregon ("Debtor"), alleges as follows:

**PAGE 1 – ADVERSARY COMPLAINT**

## I.    JURISDICTION AND VENUE

1.    On August 31, 2012 ("Petition Date"), Debtor filed a voluntary petition under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the District of Oregon, and the Court entered an order for relief. The case was converted under Chapter 7 of the U.S. Bankruptcy Code by order of the Court dated October 2, 2013.

2.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b), 28 U.S.C. § 157(b), 28 U.S.C. § 157(c), and Bankruptcy Rule 7001. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (E), (F), (H), and (O).

3.    The fraudulent transfers described in this Adversary Complaint include transfers of funds from Debtor's bank accounts in Oregon.  The Defendant Banks are all domiciled in Oregon. Jurisdiction is also based in part upon proofs of claims which Umpqua Bank, Century Bank, and Pacific Continental Bank filed in Debtor's case.  By filing proofs of claims, those defendants consented to the Court's jurisdiction.  Finally, all defendants have:  (a) intentionally taken advantage of the rights, benefits, and privileges of conducting business and/or transactions in Oregon; (b) purposefully availed themselves of the laws of Oregon by undertaking significant commercial undertakings in Oregon; (c) derived significant revenue from Oregon; and (d) maintained minimum contacts and/or general business contacts with Oregon.

4.    Venue is proper pursuant to 28 U.S.C. § 1409.

**PAGE 2 – ADVERSARY COMPLAINT**

**KENT & JOHNSON, LLP**
1500 SW Taylor Street
Portland, Oregon  97205
(503) 220-0717

## II.    THE PARTIES

5.      Plaintiff Thomas A. Huntsberger is the court-appointed Chapter 7 trustee of Debtor ("Plaintiff" or "Trustee").  He has the power and authority to bring claims and to avoid and recover transfers pursuant to §§ 541, 544, 547, 548, 549, 550, and 551 of the Bankruptcy Code and has the rights and powers of any creditor under § 544 of the Bankruptcy Code.  Trustee files this action in his capacity as Trustee.

6.      Debtor was a general partnership in Oregon whose stated business purpose was insurance premium financing.  Just before the Petition Date, the pre-existing general partnership, Berjac of Oregon, merged with a separate "sister" general partnership, Berjac of Portland, and Debtor Berjac of Oregon is the surviving entity.  Throughout this Complaint, "Debtor" refers to the merged entity, Berjac of Oregon, and its predecessors, the separate partnerships Berjac of Oregon and Berjac of Portland.  Each of the two pre-existing Berjac general partnerships was wholly-owned by the same two partners, Michael Holcomb and Gary Holcomb, who became the partners of Debtor.

7.      In addition to the "Berjac" partnerships described above, Michael Holcomb and Gary Holcomb were, alone or with other family members, owners and operators of a number of related business organizations. The Holcomb Family Limited Partnership ("HFLP") is and was an Oregon limited partnership organized in or around 1997.  The general partners are or were Fred and Betty Holcomb, the parents of Michael and Gary.  The limited partnership interests are or were owned by Holcomb family members.  Wagon Wheel Properties LLC ("WWP") was organized in or around

**PAGE 3 – ADVERSARY COMPLAINT**

1986 as a general partnership, and converted to a limited liability company in 2009, and

holds title to an office building in Eugene, Oregon, from which Berjac conducted its

business.  The Holcomb Family Trust ("HFT") is a trust organized to hold certain real

and personal property and other assets for the benefit of Holcomb family members.

Because of the common ownership and control of all of these entities, and because

Debtor's accounting reflects related-party transactions and commingling of funds among

these entities, the Holcombs and the various related business organizations are sometimes

referred to as "the Berjac enterprise."

      8.     Defendant Umpqua Bank was founded in 1953, and Umpqua Holdings

Corporation ("Umpqua Bank") was later formed in 1999.  Umpqua Bank has its primary

office in Portland, Oregon, and maintains offices and branches in Oregon, Washington,

California, and Nevada.  Umpqua Bank has filed a proof of claim in Debtor's bankruptcy.

      9.     Defendant Century Bank was founded in 2003 in Eugene, Oregon.  Until

its merger with Pacific Continental Bank, Century Bank was headquartered in Eugene,

Oregon and offered banking services throughout Lane County.  On February 4, 2013,

Century Bank was acquired by and merged into Pacific Continental Bank.

      10.    Defendant Pacific Continental Bank was founded in 1972 in Eugene,

Oregon.  It is headquartered in Eugene and has 15 offices in Oregon and Washington.  In

2012-13, its holding company, Pacific Continental Corporation, acquired Century Bank.

Pacific Continental Corporation dba Pacific Continental Bank ("Pacific Continental

Bank") is the successor in interest to Century Bank and as such is liable for all claims

**PAGE 4 – ADVERSARY COMPLAINT**

against Century Bank as stated herein.  Both Pacific Continental Bank and Century Bank have filed proofs of claim in Debtor's bankruptcy.

11.     Defendant Summit Bank was founded in 2004 in Eugene, Oregon.  It is headquartered in Eugene, Oregon.

12.     Defendant Jones & Roth, P.C. ("J & R" or "the Accountants"), is an accounting firm, in business since the 1940s and organized as an Oregon professional corporation since at least 1982.  J & R is owned by and employs certified public accountants, who have such credentials only as a result of meeting specific statutory and regulatory standards. At all times material, J & R has held itself out as available and qualified to provide to individuals and businesses a full array of accounting services and business advice/consulting, including but not limited to: audit and assurance services, accounting and bookkeeping advice, preparation of financial statements, accounting and payroll advice, tax planning and preparation, business valuation services, retirement planning and related audits and services. All of the services from J & R that are the subject of this Complaint were provided either by certified public accountants, or by other professionals and staff employed by J & R and working under the supervision of certified public accountants, all of whom were acting within the scope of their employment by J & R.

### III.     THE *PONZI* SCHEME

13.     Debtor ostensibly financed insurance policy premiums for loggers, farmers, and business owners who chose not to pay the premiums all at once.  Debtor's typical customer would pay some portion – usually 25% – of its annual premium.  Debtor

**PAGE 5 – ADVERSARY COMPLAINT**

would advance to the insurer the balance for the customer at the time of purchase, then accept monthly payments of principal and interest from the customer/insured over the life of the policy.  The insurance premium loans were supposed to be evidenced by promissory notes and "secured" because, in the event of the customer's default, Debtor had the ability to cancel the policy and recover the unused portion of the premium.  The customer's down payment was intended to give Debtor a 90-day "cushion" so that a cancellation and resulting refund would be enough to pay the balance of the premium loan.

14.     Under the guise of supporting its insurance premium financing operations, Michael Holcomb and Gary Holcomb, acting for themselves and through others ostensibly on behalf of Debtor, solicited and received money from investors who invested their money with Debtor and were promised a return, typically between five and six percent compounded quarterly on their money.  The vehicle for tracking these "investments" was Debtor's issuance of unsecured promissory notes to the investors.  At all material times, Debtor was not registered with the Securities and Exchange Commission or the Oregon Department of Consumer and Business Services.

15.     As it turns out, little investor money actually went to Debtor's insurance-premium financing business.  By the Petition Date, Debtor had total outstanding premium finance receivables of only $1.3 million, of which approximately 25% was uncollectible.  By comparison, the debt to investors was over $40 million.  Instead of insurance premium financing, the vast bulk of money received from investors was diverted for the personal use of Debtor's owners, Michael Holcomb and Gary Holcomb, and to their

**PAGE 6 – ADVERSARY COMPLAINT**

**KENT & JOHNSON, LLP**
1500 SW Taylor Street
Portland, Oregon  97205
(503) 220-0717

families, or funneled into highly speculative and unsuccessful real estate development projects that benefitted the Holcombs, or it was used to pay interest and return principal to earlier investors.  Using money from new investors to repay earlier investors in order to maintain the guise of a legitimate profit-making business is a *Ponzi* scheme *per se*.

16.    A key part of this *Ponzi* scheme was that Michael Holcomb and Gary Holcomb, acting themselves and through others ostensibly on behalf of Debtor, accrued for investors returns on the amounts that they had invested on a quarterly basis, and allowed investors to withdraw money from their accounts at any time.  In order to cushion against the ebb and flow of investor money, and to avoid a "run on the bank" when current funds were insufficient to pay investor calls, Michael Holcomb and Gary Holcomb, acting themselves and through others ostensibly on behalf of Debtor, established lines of credit, first with Umpqua Bank, and then later with Pacific Continental Bank.  The Holcombs, on behalf of themselves and HFLP, also established lines of credit with Century Bank and Summit Bank.  At all material times, the banks knew (1) that Michael Holcomb and Gary Holcomb, acting themselves and through others ostensibly on behalf of Debtor, would directly receive and would directly repay money advanced on the HFLP credit lines; (2) that HFLP conducted no business operations and, therefore, there was no business purpose to HFLP for the HFLP lines of credit; (3) that the proceeds of the Banks' loans would be and were used to pay investor calls received by Michael Holcomb and Gary Holcomb, acting themselves and through others ostensibly on behalf of Debtor, and (4) that new funds paid in by investors would be used to repay the credit line advances that had been made to meet prior investor calls.

**PAGE 7 – ADVERSARY COMPLAINT**

17.    Debtor was functionally insolvent and did not operate profitably during the time period the transfers described in this Adversary Complaint were made.  There was no legitimate or lawful business purpose for the bank lines of credit; instead, the Debtor used the lines of credit to pay investor calls, and to prevent the collapse of the *Ponzi* scheme, in order to perpetuate its existence.  Michael Holcomb and Gary Holcomb, acting themselves and through others ostensibly on behalf of  Debtor, paid down the lines of credit from new investor money as it came in.  In this way, Michael Holcomb and Gary Holcomb, acting themselves and through others ostensibly on behalf of Debtor, operated as a *Ponzi* scheme.

18.    Michael Holcomb and Gary Holcomb, acting themselves and through others ostensibly on behalf of Debtor, failed to disclose to investors that Debtor was functionally insolvent, that it was not operating at a profit, that it would use their principal investments to pay returns to earlier investors, that it would use their principal investments for the personal use of the Holcombs, or that it would funnel their principal investments into speculative real estate development projects that benefitted the Holcombs.

## IV.    DEFENDANTS' ROLES IN THE *PONZI* SCHEME

19.    The *Ponzi* scheme—in which investors were told by Michael Holcomb and Gary Holcomb, acting themselves and through others ostensibly on behalf of Debtor, that Debtor was engaged in a safe and secure business of insurance-premium financing, and that investors could add to and withdraw their money at any time, on demand—was

**PAGE 8 – ADVERSARY COMPLAINT**

accomplished with, and required the assistance of, the Banks and the Accountants. Without their assistance, the scheme would have collapsed.

20.     Since at least sometime in the 1990s up until the Petition Date, J & R provided accounting services to Debtor (including the predecessor partnerships), to Debtor's partners Michael Holcomb and Gary Holcomb, to other Holcomb family members, and to at least two of the related business entities, HFLP and WWP.  Among other things, for at least the fiscal years 2002 through 2011, J & R prepared financial statements and partnership tax returns for Debtor.  For at least the fiscal years 2009 through 2011, J & R prepared partnership tax returns for HFLP and WWP. The financial statements issued by J & R for Debtor or its affiliates are identified by signed and dated cover letters on J & R letterhead that reflect the approximate date J & R's work on the particular year's statements concluded and the level of investigation and analysis purportedly applied by J & R to management's accounting data.

21.     At all times material to this action, J & R was aware that Debtor was a customer of the Defendant Banks and that the Banks were making lending decisions based, at least in part, on the financial statements issued by J & R.  J & R also knew that in the absence of accountant-prepared financial statements, Debtor's ability to maintain or obtain new credit relationships with the Banks would be impaired.

22.     Umpqua Bank's relationship with Debtor began in approximately 1992 and continued to mid-2009. To keep the *Ponzi* scheme concealed from past and future investors, Debtor had to have the ability to pay any investor's demand for partial or full repayment promptly.  When, as frequently happened, new investor funds and the meager

**PAGE 9 – ADVERSARY COMPLAINT**

profits from Debtor's premium insurance financing business lagged behind the

Holcombs' cash needs and obligations to investors, Umpqua Bank, Century Bank, Pacific

Continental Bank, and Summit Bank provided the cash to pay the investor calls through

advances under the lines of credit.  Those lines of credit were not necessary for the

insurance premium financing business that Debtor operated.  As new investor money was

received, Debtor used that money to repay advances from the lines of credit that Umpqua

Bank, Century Bank, Pacific Continental Bank, and Summit Bank provided.

      23.     Starting in approximately 1992 and ending in mid-2009, Umpqua Bank

provided similar lines of credit that allowed Michael Holcomb and Gary Holcomb, acting

themselves and through others ostensibly on behalf of Debtor, to operate and conceal the

*Ponzi* scheme during that time period.  Umpqua Bank's credit reports show that it knew

that revenues from Debtor's insurance premium financing business were insufficient to

timely pay its financial obligations to investors and that a substantial reason for the lines

of credit was to allow Debtor to pay those obligations.  Umpqua Bank also knew that the

primary source of repayment of the lines of credit was new investor deposits.  In 2009,

Umpqua Bank agreed to delay requiring its lines of credit to be paid off in order to permit

Debtor to obtain additional investor funds and to borrow money from another bank to

replace Umpqua Bank.  Doing so enabled Umpqua Bank to be repaid, and enabled

Debtor to continue to operate the *Ponzi* scheme seamlessly, without a delay in payments

to investors during a period of high withdrawals.  In 2008, Debtor paid Umpqua Bank in

excess of $5,900,000, mostly from funds from investors.  When it retired the Umpqua

Bank line of credit, an Umpqua e-mail of June 26, 2009, to members of Umpqua's

**PAGE 10 – ADVERSARY COMPLAINT**

investment team flatly stated: *"with all the Ponzi schemes coming to light these days, we are so lucky they didn't have a panic and run on the money from their investors."*

24.     Starting in 2008, Century Bank and Pacific Continental Bank began providing lines of credit for use as alleged above, and replaced the role of Umpqua Bank alleged above.  Before doing so, Century Bank and Pacific Continental Bank investigated the business of Debtor and asked questions of Michael Holcomb - then a Pacific Continental Bank Board member.  Their investigation disclosed that the operations of the insurance premium finance business were a small part of the overall operations of Debtor, and that revenues from Debtor's insurance premium financing business were insufficient to timely pay its obligations to its investors and the banks.  Following their investigation, Century Bank and Pacific Continental Bank provided lines of credit that were used to cover investor withdrawals.  Additionally, an Umpqua Bank loan officer later joined Century Bank —and brought with him that bank's and his personal knowledge of Debtor's business and operations.

25.     Michael Holcomb and Gary Holcomb, acting themselves and through others ostensibly on behalf of Debtor, with Century Bank, used HFLP to make available additional lines of credit, which were used to provide additional short-term cash advances to Debtor in amounts that Debtor could not obtain on its own from Century Bank and/or Pacific Continental Bank.  Lending limits restricted the ability to make additional loans to Debtor.  The lines of credit were secured by pledges of shares of Pacific Continental Bank stock owned by HFLP.  HFLP provided the collateral and lines of credit to enable continuation of the *Ponzi* scheme. Century Bank and Pacific Continental Bank knew that

**PAGE 11 – ADVERSARY COMPLAINT**

the monies advanced on the lines of credit were not going to be used by HFLP; indeed, one credit officer at Century Bank termed the HFLP line of credit as "*a last resort reserve to meet funding needs of Berjac of Oregon and/or Berjac of Portland*."  Credit line advances and payments to repay were made directly to and by Debtor.

26.    During various times material to this action, each of the Defendant Banks held multiple deposit accounts for Debtor, and for Michael Holcomb and Gary Holcomb and other members of the Holcomb family, and for other related business organizations of the Berjac enterprise.  In addition, from time to time, each of the Defendant Banks also made loans to Michael Holcomb and Gary Holcomb and the other members of the Holcomb family, and other business organizations in the Berjac enterprise.  All of the Banks granted such credit lines and made advances and provided other banking services expecting to profit thereby in the form of fees, interest and other charges.

## V.    AMOUNTS RECEIVED BY THE BANKS

27.    Within ten years of the Petition Date, Umpqua Bank received $25,750,861 from Debtor.

28.    Within ten years of the Petition Date, Century Bank received $22,955,626 from Debtor.

29.    Within ten years of the Petition Date, Pacific Continental Bank received $6,328,297 from Debtor.

30.    Within ten years of the Petition Date, Summit Bank received $251,906 from Debtor.

**PAGE 12 – ADVERSARY COMPLAINT**

31.     Within two years of the Petition Date, Century Bank received $11,281,585 from Debtor.

32.     Within two years of the Petition Date, Pacific Continental Bank received $793,651 from Debtor.

33.     Within two years of the Petition Date, Summit Bank received $168,289 from Debtor.

34.     The transfers referred to in paragraphs 27 – 33 are collectively referred to as "Fraudulent Transfers."

## VI.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Fraudulent Transfers Made Within Ten Years of Petition Date –
Against All Bank Defendants)**

35.     Trustee re-alleges the prior allegations.

36.     At all times relevant to the Fraudulent Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against Debtor that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

37.     At all times relevant to the Fraudulent Transfers, there was one or more unsecured creditors who could not have reasonably discovered said Fraudulent Transfers until after the filing of the bankruptcy petition in this case.

**PAGE 13 – ADVERSARY COMPLAINT**

38.    ORS 95.280 allows recovery of damages for claims asserted within one year after discovery.  As such, the Bank Defendants are liable for transfers from August 31, 2002, until August 31, 2012.

39.    Each of the Fraudulent Transfers constitutes a "transfer" by Debtor as defined in ORS 95.200 *et seq*.  Those transfers are avoidable under § 544 of the Bankruptcy Code and the Oregon Uniform Fraudulent Transfer Act as Fraudulent Transfers.

40.    Within ten years prior to the Petition Date, Umpqua Bank, Century Bank, Pacific Continental Bank, and Summit Bank received Fraudulent Transfers from Debtor, as described in paragraphs 27-33.  Michael Holcomb and Gary Holcomb, acting themselves and through others ostensibly on behalf of Debtor, made the Fraudulent Transfers with the actual intent to hinder, delay, or defraud creditors of Debtor—as established by the existence of the *Ponzi* scheme.  Those creditors mostly consist of innocent investors who gave money to Michael Holcomb and Gary Holcomb, acting themselves and through others ostensibly on behalf of Debtor believing that the money was being used in a safe and secure business, insurance-premium financing.

41.    Debtor also did not receive reasonably equivalent value for the Fraudulent Transfers because, among other things, Umpqua Bank, Century Bank, Pacific Continental Bank, and Summit Bank participated in the *Ponzi* scheme by lending funds, on actual or inquiry notice, of a fraudulent scheme and, accordingly, enabling the *Ponzi* scheme by further allowing for the dissipation of assets.  Furthermore, the Fraudulent Transfers were

**PAGE 14 – ADVERSARY COMPLAINT**

made at a time when Debtor was insolvent and unable to pay its debts as they matured. Simply put, Michael Holcomb and Gary Holcomb, acting themselves and through others ostensibly on behalf of Debtor, were operating a *Ponzi* scheme, which as a matter of law was insolvent from its inception and therefore never capable of fulfilling its obligations to creditors.

42.     Umpqua Bank, Century Bank, Pacific Continental Bank, and Summit Bank received the Fraudulent Transfers at a time when they had a duty to know and understand the business of Debtor, lacked good faith, knew or should have known of the fraudulent activity at Debtor, and knew or should have known of Debtor's insolvency.

43.     As a result of the foregoing, pursuant to §§ 544, 550(a), and 551 of the Bankruptcy Code and the Oregon Uniform Fraudulent Transfer Act, the Trustee is entitled to a judgment:  (a) avoiding the Fraudulent Transfers; (b) directing that those transfers be set aside; and (c) recovering the payments associated with the Fraudulent Transfers, or the value thereof, from Umpqua Bank, Century Bank, Pacific Continental Bank, and Summit Bank.

44.     Because the Defendant Banks' conduct was intentional, willful, and fraudulent in nature, the Trustee is entitled to an award of punitive damages pursuant to ORS 31.725 not to exceed $10,000,000, in a pro-rated amount for each Defendant to be determined at trial in order to deter Defendants and each of them from engaging in said conduct in the future.

**PAGE 15 – ADVERSARY COMPLAINT**

## SECOND CLAIM FOR RELIEF

### (Fraudulent Transfers Made Within Two Years of Petition Date – Against all Bank Defendants except Umpqua Bank)

45.     Trustee re-alleges the prior allegations.

46.     Each of the Fraudulent Transfers constitutes a "transfer" of an interest in Debtor's property within the meaning of §§ 101(54) and 548 of the Bankruptcy Code.

47.     Within two years prior to the Petition Date, Century Bank, Pacific Continental Bank, and Summit Bank received Fraudulent Transfers from Debtor, as described in paragraphs 27-33.  Michael Holcomb and Gary Holcomb, acting themselves and through others ostensibly on behalf of the Debtor, made the Fraudulent Transfers with the actual intent to hinder, delay, or defraud creditors of Debtor—as established by the existence of the *Ponzi* scheme.

48.     Alternatively, as to the Fraudulent Transfers, Debtor made the Fraudulent Transfers without receiving a reasonably equivalent value in exchange for those transfers and Debtor (1) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any assets of Debtor were unreasonably small in relation to the business or transaction; or (2) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts became due. Furthermore, the Fraudulent Transfers were not made on account of a valid antecedent debt.

**PAGE 16 – ADVERSARY COMPLAINT**

**KENT & JOHNSON, LLP**
1500 SW Taylor Street
Portland, Oregon  97205
(503) 220-0717

49.     As a result of the foregoing, pursuant to §§ 548, 550, and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment:  (a) avoiding the Fraudulent Transfers; (b) directing that those transfers be set aside; and (c) recovering the payments associated with the Fraudulent Transfers, or the value thereof, from Century Bank, Pacific Continental Bank, and Summit Bank.

### THIRD CLAIM FOR RELIEF

**(Aiding and Abetting the Holcombs' Breaches of Fiduciary Duties –
Against All Bank Defendants)**

50.     Trustee re-alleges the prior allegations.

51.     Michael Holcomb and Gary Holcomb owed fiduciary duties to Debtor and its predecessors in interest.

52.     The Holcombs breached their fiduciary duties to the Berjac entities by engineering and operating the *Ponzi* Scheme as alleged above.  The Bank Defendants also owed an independent duty to comply with all banking statutes, rules, and regulations, which the bank defendants breached by extending loans to Berjac with the knowledge that said loans did not meet lawful standards.

53.     The Bank Defendants provided the lines of credit knowing that Debtor did not have the ability to make its investor commitments, and that the bank funds would be used to cover  investor demands, and with the expectation that they would be repaid from funds later received from other investors.  By providing the lines of credit that were an essential component to the continuation of the *Ponzi* scheme, the Bank Defendants

**PAGE 17 – ADVERSARY COMPLAINT**

KENT & JOHNSON, LLP
1500 SW Taylor Street
Portland, Oregon  97205
(503) 220-0717

knowingly provided substantial assistance to the Holcombs in their breaches of fiduciary duties and  breached their own independently owed regulatory duties.

54.     The Bank Defendants aided and abetted, acted in concert with, and /or conspired with the Holcombs and others causing Debtor to incur indebtedness to new investors that it had no ability to pay in amounts to be determined at trial, but in excess of $40,000,000.

55.     Said breaches of fiduciary duty, with the assistance of the Bank Defendants, did not cause Debtor damage until its actual default on said investor debts, which occurred in or about August 2012.

### FOURTH CLAIM FOR RELIEF

**(Unjust Enrichment and Restitution - Against All Bank Defendants)**

56.     Trustee re-alleges the prior allegations.

57.     The payment by Debtor of the Fraudulent Transfers was made at a time when it was insolvent, undercapitalized, or in the zone of insolvency.  Under such circumstances, retention of Fraudulent Transfers would constitute unjust enrichment and Trustee and the estate are entitled to restitution of the full amount of said transfers, as to Umpqua Bank, Century Bank, Pacific Continental Bank, and Summit Bank, plus interest.

### FIFTH CLAIM FOR RELIEF

**(Equitable Subordination - Against All Bank Defendants)**

58.     Trustee re-alleges the prior allegations.

59.     Umpqua Bank, Century Bank, Pacific Continental Bank, and Summit Bank engaged in inequitable conduct, including behavior described in this Adversary

**PAGE 18 – ADVERSARY COMPLAINT**

Complaint, which has resulted in injury to the creditors of the bankruptcy estate and has conferred an unfair advantage on these defendants.

60.     Based on the inequitable conduct of Umpqua Bank, Century Bank, Pacific Continental Bank, and Summit Bank as described above, creditors of Debtor— including its investors—have been misled as to the true financial condition of Debtor, investors have been induced to invest without knowledge of the actual facts regarding Debtor's financial condition, and/or investors and creditors are less likely to recover the full amounts due to them because of the conduct of Umpqua Bank, Century Bank, Pacific Continental Bank, and Summit Bank.

61.     While they may be entitled to claims against Debtor's estate on account of funds restored because of such avoidance claims, the Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by Umpqua Bank, Century Bank, Pacific Continental Bank, and Summit Bank, directly or indirectly against the bankruptcy estate, and only to the extent such claims are allowed, are subordinated for distribution purposes pursuant to §§ 510(c)(1) and 105(a) of the Bankruptcy Code.

62.     Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

**PAGE 19 – ADVERSARY COMPLAINT**

## SIXTH CLAIM FOR RELIEF

**(Voiding Authorization Pursuant to § 549 of the Bankruptcy Code –
Against Defendant Century Bank and its Successor in Interest
Pacific Continental Bank)**

63.     Trustee re-alleges the prior allegations.

64.     At the post-petition cash collateral hearing that occurred on or about
September 17, 2012, Century Bank requested the immediate return from the estate of a
$300,000 advance, arguing that the merger of the Berjac partnerships placed it
involuntarily in the position of providing financing for the predecessor partnership Berjac
of Oregon - financing it would never have knowingly provided. Century Bank omitted or
failed to fully disclose to the Court the full extent of its involvement with the *Ponzi*
scheme as alleged above, and that it had been knowingly providing financing to Berjac of
Oregon for years through its credit lines nominally granted to HFLP and Berjac of
Portland.

65.     Such omissions were material.  Century Bank knew that the HFLP credit
line was used by and repaid by Berjac of Oregon. Century Bank was fully aware of its
own involvement in the challenged transactions at the time of the cash collateral hearing.

66.     The Court's order allowing the return of the $300,000 advanced by
Century Bank was based on materially false information submitted to the court and its
material omissions.  For that reason, the transfer was not properly authorized and should
be voided, and Century Bank should be required to disgorge such funds received as
directed by the Court under such circumstances.

**PAGE 20 – ADVERSARY COMPLAINT**

67.     The Trustee is entitled a return of the $300,000 pursuant to § 549 of the

Bankruptcy Code, and because retention of such funds would unjustly enrich Defendant

at the expense of the bankruptcy estate and its creditors.

## SEVENTH CLAIM FOR RELIEF

### (Misrepresentation - Against Defendant Century Bank and its Successor in Interest Pacific Continental Bank)

68.     Trustee re-alleges the prior allegations.

69.     The material omissions described above constitute a claim for common

law misrepresentation, to the loss and damage of the Bankruptcy estate of $300,000.

## EIGHTH CLAM FOR RELIEF

### (Avoidance Claim Pursuant to § 544 of the Bankruptcy Code – Against Defendant Century Bank and its Successor in Interest Pacific Continental Bank)

70.     Trustee re-alleges the prior allegations.

71.     One of the lines of credit held by Pacific Continental Bank as successor in

interest to Century Bank was purportedly secured by Pacific Continental Bank stock held

by HFLP.

72.     The Debtor was pursuing recovery of the stock and held an equitable

interest in said stock.

73.     On or about July 31, 2013, Pacific Continental Bank received the sum of

$1,399,705 from the proceeds of the sale of the stock.

**PAGE 21 – ADVERSARY COMPLAINT**

74.    Pacific Continental Bank's security interest was and is subject to avoidance under § 544 of the Bankruptcy Code on account of the Debtor's interest therein.

75.    Debtor is entitled to recover the sum of $1,399,705 plus pre-judgment interest.

## NINTH CLAIM FOR RELIEF

### (Professional Negligence - Against Defendant Jones & Roth)

76.    Trustee re-alleges the prior allegations.

77.    In some years, the J & R financial statements for Debtor were issued as "reviewed" financials; in some years, the J & R financial statements were issued as "compilation reports."  Under the Statements on Standards for Accounting and Review Services issued by the AICPA, a "review" by certified public accountants consists principally of inquiries into the company's personnel and analytical procedures applied to management's financial data.  A "compilation" is a more limited accounting service that, nevertheless, results in issuance of formal financial statements bearing the signature of the accounting firm.  For both a compilation and review, the accountant is charged with establishing an understanding of the industry in which the client operates, including the accounting principles and practices generally used in the industry, sufficient to enable the accountant to compile financial statements that are appropriate in form for an entity operating in that industry.  The accountant must obtain knowledge about the client, including an understanding of the client's business and an understanding of the accounting principles and practices used by the client.

**PAGE 22 – ADVERSARY COMPLAINT**

78.    J & R, acting through its owners and employees, owed Debtor the duty to use the degree of care, skill and diligence ordinarily used by accountants practicing in the same or similar circumstances in the same or similar community.

79.    J & R, acting through its owners and employees, was negligent in one or more of the following particulars which caused damage to Debtor:

(a)    Accepting the representations of management that management's financial statements were prepared in accordance with generally accepted accounting principles ("GAAP") in the face of apparent liquidity risks, including but not limited to the imminent risk that Debtor could not meet its demand obligations;

(b)    Accepting the representations of management that management's financial statements were prepared in accordance with GAAP in the face of apparent arithmetic errors;

(c)    Failing to conduct inquiry and analysis of management's financial data consistent with the applicable standard of care;

(d)    Failing to review and analyze back-up data necessary under GAAP to support management's financial data, including but not limited to notes or other documentation necessary to support accounting for finance receivables and notes receivable;

(e)    Failing to review and analyze back-up data necessary to justify management's representation that no allowance for doubtful accounts was necessary in spite of significant delinquencies in the account balances and non-compliance by Debtor's customers with the terms of their notes;

**PAGE 23 – ADVERSARY COMPLAINT**

(f)     Failing to observe the deterioration of performance of Debtor's finance

receivables and notes receivables over the years of J & R's services and to

conform management's disclosures to GAAP for that deterioration;

(g)     Failing to review and analyze the actual performance of Debtor's receivables for

conformance with management's representations;

(h)     Failing to obtain information to support management's representations that the

carrying values of Debtor's finance and notes receivables were stated in

accordance with GAAP;

(i)     Failing to identify arithmetic errors in management's financial data;

(j)     Failing to identify the actual liquidity risks Debtor faced that meant Debtor would

be unable to meet those obligations that were subject to investor demands;

(k)     Failing to identify management's misrepresentations regarding related party

transactions, including but not limited to personal use by Michael Holcomb and/or

Gary Holcomb of Debtor's funds, intercompany loans and other transactions

among the related business entities, and commingling of funds among the

business entities;

(l)     Failing to identify management's misrepresentations in Debtor's financials

regarding the actual financial condition of related entities;

(m)     Failing to identify management's misrepresentations regarding the actual financial

condition of Debtor and the related entities as a whole;

(n)     Failing to disclose or emphasize in its accountants' reports for the benefit of

Debtor and/or its lenders or other third parties the actual liquidity risks Debtor

faced;

**PAGE 24 – ADVERSARY COMPLAINT**

(o)     Failing to identify that the business activities of Debtor amounted to a *Ponzi* scheme in that Debtor was using new investor money or new bank loans to fund demand obligations from existing investors; or

(p)     Having observed that the business activities of Debtor amounted to a *Ponzi* scheme, failing to modify its accountants' reports to make appropriate disclosure and emphasis of the matter.

80.     J & R knew or, as a result of reasonable inquiry consistent with the applicable standard of care, should have known that Debtor's business activities amounted to a *Ponzi* scheme for at least one or more of the following reasons:

(a)     Debtor's accounting practices and record-keeping did not meet industry standards;

(b)     Management for Debtor ignored the formalities of its business organizations by using business funds for personal purposes or for purposes not related to its ostensible business purposes;

(c)     Management for Debtor commingled Debtor's funds with the funds of the related business organizations that management also owned or controlled;

(d)     Debtor's non-conforming accounting practices and record-keeping were designed to prevent discovery by  other third parties of Debtor's actual financial condition;

(e)     The amounts management reported for notes receivables and finance receivables were at all material times inadequate to survive even a modest demand against Debtor's demand payables;

(f)     Debtor's receivables' values were not supported by back-up documentation consistent with industry standards;

**PAGE 25 – ADVERSARY COMPLAINT**

(g)     Debtor's notes payables were not represented by back-up documentation consistent with industry standards;

(h)     The performance of Debtor's receivables materially deteriorated over the period of J & R's services as reflected in Debtor's actual collection experience and aged receivables listing;

(i)      The performance of Debtor's receivables materially deteriorated over the period of J & R's services as reflected in interest rates Debtor was reportedly able to charge for its premium financing services;

(j)     Debtor was using new investor money and new bank loans to meet obligations to existing investors;

(k)     Debtor ceased issuing accountant-compiled or –reviewed financial statements for the predecessor partnership Berjac of Oregon altogether, in order to avoid discovery of its actual financial condition and the financial condition of enterprise as a whole;

(l)     At all times material, Debtor was insolvent because the value of its assets, as reported on its financial statements, was materially over-represented and the value of its liabilities, as reported on its financial statements, was materially under-represented.

81.     J & R's participation in the *Ponzi* scheme was a breach of the applicable standard of care and a materially contributing factor in the continuation of the scheme which, in turn, caused Debtor to incur indebtedness to new investors that it had no ability to repay.

**PAGE 26 – ADVERSARY COMPLAINT**

**KENT & JOHNSON, LLP**
1500 SW Taylor Street
Portland, Oregon  97205
(503) 220-0717

82.     As a direct result of this conduct, Debtor incurred indebtedness to new investors that it had no ability to pay in amounts to be determined at trial, but in excess of $40,000,000.

83.     Said breaches of duty did not cause Debtor damage until its actual default on said investor debts, which occurred in or about August 2012.

### TENTH CLAIM FOR RELIEF

#### (Aiding and Abetting Fraudulent Conveyances - Against Jones & Roth)

84.     Trustee re-alleges the prior allegations.

85.     J & R  provided substantial assistance to the Bank Defendants and the Holcombs by providing them with accounting reviews and compilations and other services alleged above that acted as cover for the Holcombs to continue the *Ponzi* scheme, and as cover for the Bank Defendants to continue to provide financing for said scheme.

86.     J & R aided and abetted, acted in concert with, and/or conspired with the Holcombs and the Bank Defendants to provide substantial assistance to the Bank Defendants to complete the Fraudulent Transfers, to wit:  $25,750,861 transferred to Umpqua Bank; $22,955,626 transferred to Century Bank and its successor in interest Pacific Continental Bank; $6,328,297 transferred to Pacific Continental Bank; and $251,906 transferred to Summit Bank.

87.     J & R is jointly and severally liable for the return of these Fraudulent Transfers to the Bankruptcy estate.

**PAGE 27 – ADVERSARY COMPLAINT**

KENT & JOHNSON, LLP
1500 SW Taylor Street
Portland, Oregon  97205
(503) 220-0717

88.     At all times relevant to the Fraudulent Transfers, there were one or more

unsecured creditors who could not have reasonably discovered said Fraudulent Transfers

until after the filing of the bankruptcy petition in this case.

89.     ORS 95.280 allows recovery of damages for claims asserted within one

year after discovery.  As such, J & R is liable for transfers from August 31, 2002, until

August 31, 2012.

## ELEVENTH CLAIM FOR RELIEF

### (Aiding and Abetting Breaches of Fiduciary Duty - Against Defendant Jones & Roth)

90.     Trustee re-alleges the prior allegations.

91.     The Holcombs breached their fiduciary duties to the Berjac entities by

engineering and operating the *Ponzi* Scheme as alleged above.

92.     J & R provided substantial assistance to the Bank Defendants and the

Holcombs by providing them with accounting reviews and compilations alleged above

that acted as cover for the Holcombs to continue the *Ponzi* scheme, and for the Bank

Defendants to continue to provide financing for said scheme.

93.     J & R aided and abetted, acted in concert with, and/or conspired with the

Holcombs and the Bank Defendants to provide substantial assistance to the Bank

Defendants and the Holcombs which caused Debtor to incur indebtedness to new

investors that it had no ability to pay in amounts to be determined at trial, but in excess of

$40,000,000.

**PAGE 28 – ADVERSARY COMPLAINT**

94.     Said breaches of fiduciary duty, with the assistance of J & R, did not cause Debtor damage until its actual default on said investor debts, which occurred in or about August 2012.

## VII.    AMENDMENT

95.     Trustee reserves the right to amend this Complaint as further information or evidence becomes available through discovery or otherwise.

**WHEREFORE**, Trustee prays for a judgment as follows:

A.     On the First Claim against all Bank Defendants, pursuant to §§ 544, 550, and 551 of the Bankruptcy Code and the Oregon Uniform Fraudulent Transfer Act: (a) avoiding and preserving transfers made to Umpqua Bank,  Century Bank, Pacific Continental Bank, and Summit Bank within ten years prior to the Petition Date; (b) directing that these transfers be set aside; (c) recovering these transfers, or the value thereof:  $25,750,861 from Umpqua Bank; $22,955,626 from Century Bank and its successor in interest Pacific Continental Bank; $6,328,297 from Pacific Continental Bank; $251,906 from Summit Bank; and (d) an award of punitive damages in amounts to be determined at trial, not to exceed $10,000,000;

B.     On the Second Claim against all Bank Defendants (except Umpqua Bank), pursuant to §§ 548, 550, and 551 of the Bankruptcy Code:  (a) avoiding and preserving transfers made to Century Bank, Pacific Continental Bank, and Summit Bank within two years prior to the Petition Date; (b) directing that these transfers be set aside; (c) recovering these transfers, or the value thereof:  $11,281,585 from Century Bank and its successor in interest Pacific Continental Bank; $793,651 from Pacific Continental Bank; and $168,289 from Summit Bank.

**PAGE 29 – ADVERSARY COMPLAINT**

**KENT & JOHNSON, LLP**
1500 SW Taylor Street
Portland, Oregon  97205
(503) 220-0717

C.      On the Third Claim against the  Bank Defendants and each of them, for an award of damages against Umpqua Bank, Century Bank, Pacific Continental Bank, and Summit Bank and each of them in amounts not to exceed $40,000,000.

D.      On the Fourth Claim against all Bank Defendants, as to all transfers to Umpqua Bank, Century Bank, Pacific Continental Bank, and Summit Bank, recovery of the full value of those transfers;

E.      On the Fifth Claim against all Bank Defendants, for subordination of all proofs of claim of Umpqua Bank, Century Bank, Pacific Continental Bank, and Summit Bank which have been filed or brought or which may hereafter be filed or brought by, on behalf of, or for the benefit of any of the Bank Defendants or their affiliated entities, against Debtor's estate, in this bankruptcy or related bankruptcy proceedings, pursuant to §§ 510(c)(1) and 105(a) of the Bankruptcy Code;

F.      On the Sixth Claim, pursuant to § 549 of the Bankruptcy Code against Century Bank and its successor in interest, Pacific Continental Bank, for an Order voiding the authorization of the $300,000 transfer and  recovery of the same;

G.      On the Seventh Claim against Century Bank and its successor in interest, Pacific Continental Bank, for damages in the amount of  $300,000;

H.      On the Eighth Claim, pursuant to § 544 of the Bankruptcy Code against Century Bank and its successor in interest, Pacific Continental Bank, for damages in the amount of $1,399,705;

I.      On the Ninth Claim, against Jones & Roth, for an award of damages in amounts not to exceed $40,000,000;

J.      On the Tenth Claim, against Jones & Roth, for an award of damages in amounts not to exceed $55,286,690;

**PAGE 30 – ADVERSARY COMPLAINT**

K.      On the Eleventh Claim, against Jones & Roth, for an award of damages in amounts not to exceed $40,000,000

L.      On all claims for relief, establishment of a constructive trust over the proceeds of all transfers in favor of the Trustee for the benefit of the estate of Debtor;

M.      Awarding Trustee all applicable interest, costs, and disbursements of this action;

N.      Granting Trustee such other, further and different relief as the Court deems just, proper, and equitable.

DATED this 28th day of August, 2014.

**KENT & JOHNSON, LLP**

  s/ *Christopher H Kent*
Christopher H. Kent, OSB#852530
ckent@kentlaw.com
Leslie S. Johnson, OSB#954727
ljohnson@kentlaw.com
(503) 220-0717 (Telephone)
(503) 220-4299 (Fax)
Attorneys for Thomas A. Huntsberger, Trustee

80859

**PAGE 31 – ADVERSARY COMPLAINT**